## CLARENCE CLAWSON v. STATE OF NEBRASKA.

FILED JULY 11, 1914. No. 18,545.

1. **Criminal Law:** PRELIMINARY EXAMINATION: WAIVER. Where it is shown by the transcript of the examining magistrate's court, that a complaint was filed charging the accused with murder in the first degree, that upon his arrest he was taken before the magistrate for preliminary examination, that he was arraigned and entered a plea to the complaint of not guilty, and waived examination, whereupon he was held to appear before the district court, this is a sufficient compliance with the law requiring preliminary examinations in felony cases.

2. ———: APPEAL: SUFFICIENCY OF EVIDENCE. Where, in a jury trial, the evidence upon a material part of the case is conflicting, and there is sufficient to sustain the verdict, the finding of the jury thereon must be final; they being the sole judges of the weight of the testimony of the witnesses.

3. **Homicide:** SUFFICIENCY OF EVIDENCE. The evidence is examined, and stated in the opinion in part, and *held* to sustain a verdict of guilty of murder in the second degree.

4. ———: TRIAL: INSTRUCTIONS: QUESTIONS FOR JURY. Where the information charged defendant with the crime of murder in the first degree, the questions of premeditation and deliberation were for the jury to decide, but, where they found him guilty of murder in the second degree, those questions were eliminated, and were therefore unimportant.

5. **Criminal Law:** EXPERT EVIDENCE. If there is any element of science, or skill, in a matter being investigated before a trial jury, it is not reversible error for the court to admit expert testimony thereon, even though the element of science was slight.

6. ———: INSTRUCTIONS. It is not reversible error, where instructions are asked by defendant, and given by the court, for them to show that they are given at the request of the defendant.

7. **Instructions** to the jury given by the court are examined, and found not to be erroneous.

8. **Homicide:** SENTENCE. The term of imprisonment imposed by the sentence of the court is not found to be excessive under all the circumstances of the case.

ERROR to the district court for Saline county: LESLIE G. HURD, JUDGE. *Affirmed.*

*Bartos & Bartos,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

REESE, C. J.

Plaintiff in error, who will be referred to as defendant, was informed against in the district court for Saline county, charged with the crime of murder in the first degree in the killing of one Ross McKinzey. There was a jury trial, which resulted in a verdict of murder in the second degree being returned against him, and on which he was sentenced to confinement for 15 years in the state penitentiary. He alleges error, and brings his cause to this court for review.

One of the alleged errors insisted upon, which was presented in the district court in a motion to quash the information, was that defendant had no preliminary examination. The transcript of the county judge, before whom defendant was taken upon his arrest, contains the follow-

ing recital: "Defendant, Clarence Clawson, present in court, was duly arraigned and plead not guilty to the complaint. Examination thereof was waived. On consideration of the files, I find there is probable cause to believe that the said defendant Clarence Clawson committed the offense charged in the complaint. It is further found that said offense charged is not bailable, and defendant is remanded to the custody of the sheriff until the next term of the district court of Saline county, Nebraska." This is sufficient to give the district court jurisdiction. The law requiring a preliminary examination before an examining magistrate was enacted for the benefit of the accused, and he may waive it, if he so desires. *Reinoehl v. State,* 62 Neb. 619; *Latimer v. State,* 55 Neb. 609. Where the record of the filing of a complaint before an examining magistrate against a defendant, his arrest and arraignment, and that he waived examination, is shown, this is a sufficient compliance with the law. *Korth v. State,* 46 Neb. 631.

It is insisted that the evidence adduced at the trial does not sustain the verdict of murder in the second degree, and, at most, does not show the commission of a higher crime than manslaughter. This requires an investigation of the evidence submitted to the jury. There is no contention that decedent was not killed by defendant, but it is contended that, under the circumstances shown, the verdict could not legally have been guilty for so great a crime as found. It appears that the tragedy occurred in the city of Wilbur, in the night, during a street fair or carnival; that defendant's wife and another woman were there for immoral purposes; that defendant at the time was not with them, but was so located as to act as solicitor for his wife, and so that she could bring and deliver to him the money received by her for her debauchery, and which he received, she returning to her crimes. Decedent (McKinzey) approached the other woman upon the street, asking her if she was there for money, to which she gave an affirmative answer. They turned into an alley, where defendant's wife joined them. Decedent became involved

in a dispute with the other woman and struck her, knocking her down, following up the assault by further violence. She called to defendant's wife for help. Defendant's wife caught him by the shoulder, and ordered him to cease striking the other woman, whereupon he arose and assaulted her, striking her in the face with his fist. She called for defendant, and when he went to her relief he saw decedent strike his wife the second time. He interfered, and an altercation occurred between them, followed by blows. Defendant had a razor, which he used on decedent, cutting his throat so that he soon thereafter died. There is but little conflict in the testimony as to many of these facts. However, there is some conflict as to the details of what occurred immediately before and at the time of the cutting of decedent's throat. The woman, who gave her name as Craft, testified on the part of the state that, when defendant's wife called for her husband, McKinzey struck her twice, at which time defendant came, and McKinzey said: "Who are you?" Clawson, the defendant, said: " 'Don't hit that woman. I will fix you so you will never hit another.' Then they sprang together, McKinzey taking Clawson by the throat and by the wrist; then they fell apart again. There were some words passed, but I don't remember what they were. Then they came together again. I saw Clawson's arm shoot out; McKinzey stagger back, putting his hand to his throat. Clawson says, 'Come, let's make our get-away from here.' We turned and left." In another part of her testimony, she was asked: "Q. Now, when they fell apart, what happened? A. They went back together again, Mr. Clawson's hand shot out. Q. Where were McKinzey's hands at that time? A. His hands didn't go out. Q. What do you mean by that? Just describe how they were, if you know? A. As far as I saw, his hands were hanging to his sides. Q. And then what happened? A. Clawson's hand shot out and McKinzey put his hand to his throat and staggered back. Q. And then what happened? A. We left there then. Q. What did Clawson say, if anything? A. He says, 'Come, let's get away from here.' "

While the defendant had the perfect legal right to defend himself and wife from assaults by McKinzey, yet, if the jury believed the testimony of this witness, the danger of further assaults had apparently passed, and the conflict was between the two men. If she told the truth, defendant became the aggressor in the use of the razor, and would have to be held responsible for his act, in the use of the deadly weapon, no matter what his intentions may have been. The evidence all tends to show that all the parties to the transaction were of the most debased of human kind, little, if any, above the dumb brutes—one apparently no better than the other. The testimony of defendant and his wife, if believed by the jury, might place the act of the killing in a less criminal light; but, the jury being the sole judges of the weight of the testimony, we must accept their verdict as final upon that question. This being true, the verdict of guilty of murder in the second degree will have to be sustained.

It is insisted that the evidence adduced did not show premeditation and deliberation on the part of defendant, which would be necessary to constitute murder in the first degree, and the jury should have been so instructed. The information charged murder in the first degree. The question of premeditation and deliberation were for the decision of the jury, and therefore it was proper for the court to instruct on that phase of the case, leaving it for the jury to decide. They found defendant guilty of murder in the second degree, which eliminated the subjects of deliberation and premeditation. We find no just ground for complaint in this part of the case.

It is complained that there was error in the exclusion of offered testimony as to the condition of McKinzey as to whether he was excited at and during the time of his assault upon the woman Craft. In this there was no error, as that episode had passed and the woman was on her feet before defendant appeared upon the scene. The proposed evidence lacked the element of materiality.

It is next contended that the court erred in permitting evidence tending to show that defendant had been guilty

of crimes other and disconnected with the one charged in the information. There is no question but that both defendant and his wife had been leading the most abandoned and criminal lives, and that without shame or remorse. This was shown throughout the whole case by both. The evidence of defendant's arrest at one time was brought out in his cross-examination. His wife testified that she had never known him to be engaged in a fight. She was asked on cross-examination if he had not had a fight with a policeman in Lincoln. Her answer was that for an insult he had hit a policeman, but there was no fight. The cross-examination was proper enough, but barren of results, having brought out no fact to the disparagement of defendant; therefore, even if erroneous, could not have been prejudicial.

Defendant testified, in substance, that when he made use of the razor upon McKinzey, he intended to cut him, thus inflicting a wound, but did not intend to reach his throat, nor cause his death; that when he struck at McKinzey with the razor McKinzey thew up his arm, thus striking and elevating defendant's arm and causing the razor to strike the throat and inflicting a wound not intended. Dr. Dodson was called to see McKinzey after the infliction of the wound and before his death. The doctor made a careful examination of the wound, and, upon the witness-stand, gave a detailed description, showing the point of commencement and termination of the wound, its curvature, its line of direction, the smoothness of the cut, etc. He had also seen and heard the demonstration of the tragedy as given and made before the jury by defendant. He was called as an expert on rebuttal, and was asked, in substance, if that wound could have been made in the manner described by defendant, and he gave it as his opinion that it could not. This was objected to as not involving any question of science or skill, and that the conclusion was for the jury, and not for the witness. It must be conceded that the question presented is close to the line, and there is some degree of force in the contention by defendant's counsel, yet, taking all the circumstances into

consideration, we are not prepared to say that the decision of the court was erroneous. In part, at least, the doctor's observation of decedent may have been, and probably was, sufficient to justify him in forming an expert opinion as to the manner in which the wound was inflicted. It is perhaps true that any layman could form some opinion as to the question propounded, but it is probably equally true that, under the circumstances, the doctor's expert opinion would be of greater value in conveying the truth.

Certain instructions to the jury were asked by defendant, and given by the court, the court stating thereon that they were "asked by defendant." Exceptions appear to have been taken upon that ground. We do not understand that there is any well-defined rule upon that subject with the district courts of the state, and can see no ground of prejudice to defendant resulting from the action of the court. It is thought by some practitioners that it is preferable to have the jury informed that the instruction is from the party offering them, that it will thereby have the greater weight, etc. While it is perhaps better practice to let all instructions given as being by the court, we know of no hard and fast rule upon the subject. We find no prejudicial error in the action of the court in this behalf.

The instructions given by the court to the jury are criticised, but they are too long to be set out here. We have carefully examined them, and find that they are not open to the criticisms made.

It is insisted that the confinement imposed by the sentence is excessive. Defendant is a young man. He had fallen into a life of crime. The trend of rational modern thought is that penalties imposed by the criminal law are are not for revenge or the infliction of punishment, but for the protection of society and the reformation of the guilty party. It is to be hoped that defendant may determine to abandon all thoughts of his course of criminal conduct, and, should he prove himself worthy of executive clemency, that clemency can be granted to him after a suitable time, but we do not see it to be our duty to inter-

fere with the judgment of the district court, which is hereby

AFFIRMED.

Rose, J., not sitting.

Letton, J., concurring in part.

I think the trial court erred in overruling the objection to the question propounded Dr. Dodson.

"It is necessary in the examination of all such witnesses that questions should be so framed as not to call on the witness for a critical review of the testimony given by the other witnesses, compelling the expert to draw inferences or conclusions of fact from the testimony, or to pass on the credibility of the witnesses, the general rule being that an expert should not be asked a question in such a manner as to cover the very question to be submitted to the jury." Rogers, Expert Testimony (2d ed.) sec. 26, p. 61.

"The questions to him must be so shaped as to give him no occasion to mentally draw his own conclusions from the whole evidence or a part thereof, and from the conclusion so drawn express his opinion, or to decide as to the weight of evidence or the credibility of witnesses; and his answers must be such as not to involve any such conclusions so drawn, or any opinion of the expert, as to the weight of the evidence or credibility of the witness." *McMechen v. McMechen,* 17 W. Va. 683, 694.

But this error could not be prejudicial to defendant. He testified that he intended and attempted to cut McKenzie with a razor, and the deceased in attempting to ward off the blow struck his hand and sent the razor where it cut his throat. Assuming that this theory had been established by the evidence, it would constitute no defense against the charge of which the defendant was convicted. His intention was malicious, and the fact that the assault that he made with the razor with the intention to cut the deceased resulted in a graver injury than he actually contemplated does not excuse him from the result of his unlawful act. 1 Bishop, New Criminal Law (2d ed.) secs. 328-330.

I concur in the opinion in all respects except as to this ruling of the court, and concur in the affirmance of the judgment.

SEDGWICK, J.   I agree with the concurring opinion of Judge LETTON.

HAMER, J., dissenting.

I regret that I am unable to agree with the majority opinion in this case.   I do not think that the evidence is sufficient to sustain the judgment of the court below.   It is not strong enough to support a verdict higher than manslaughter.

The second paragraph of the syllabus seems to be objectionable because it takes from the jury the exercise of its proper functions.   It attempts to confer upon the jury power not contemplated by the constitution and laws of the state.

It was bad for the defendant to use a razor.   It should be remembered, however, that the man who was killed had the defendant by the throat very shortly before the razor was used.

In reading the evidence of Dr. Dodson, I find the statement that there were two cuts.   The doctor testified: "I said it appeared to me that after the cut had been made there had been a stab wound in the same cut."   There is testimony that when the man's throat was cut the defendant's arm went out suddenly.   If there was a cut and afterwards a stab wound in the same cut, it is important how much time elapsed.   If the deceased had the defendant by the throat, and the defendant drew the razor to compel the deceased to let loose and made the first wound, if there was a wound, in attempting to get the deceased to let loose, it is highly important what time elapsed between the making of the first wound and the making of the second wound.   Of course, there is a good deal of uncertainty in the doctor's testimony.   The doctor testified:   "He first said that he went out there and they got into a fight, and

this fellow had him by the neck with his right hand, and he had a hold of him with his other hand. Q. Who did? A. McKinzey, a hold of his left hand, and he was choking him, and he said he pulled out his razor and he made a slash at him, and when he slashed at him the other fellow threw up his arm and hit him on the under side of the arm, hand, here, and that threw his hand up, he said, and threw it into his throat; that was his statement." The doctor comes to the conclusion that it was impossible to do it in that way. "Q. Now, what difference does it make? Can't I make the same cut at you, this position, as if it was this way? A. No, sir; you cannot reach back that far and make that cut; no other man can. If you was in the front of him you would not; you have got to reach around. Q. What angle do I have to stand beside of you to make that cut? A. You could stand at any angle you wanted to. * * * Q. Now, if I am on the side of you, then how did it produce that big gash there, the one that you said was more of a stab? A. It didn't produce it at that first move, I say that my opinion is there was a second strike there, sir, and I have said that all the time. Q. And you still stick to it? A. Yes, sir; I do. I believe it, and all the testimony I have heard there don't change my mind a bit."

In *People v. Fritch*, 170 Mich. 258, the defendant was prosecuted for causing death by a criminal operation. The state's case was contained in hypothetical questions asked of and answered by medical experts. In that case it was held improper for a medical expert to give his opinion of whether a criminal operation had been performed; it being the province of the court, and not of expert witnesses, to advise the jury concerning the facts necessary to establish a crime. In the same case it was held that a hypothetical question was improper which asked a medical expert for his opinion as to whether the deceased was pregnant, supposing she had taken cotton root, possessed a catheter, had made an appointment with the defendant to perform an operation upon certain terms; these things included in the hypothetical question were held to be non-

scientific data which the jury were able to comprehend and estimate without the aid of expert witnesses. It will be seen that case is very much like the instant case so far as the testimony of Dr. Dodson relating to the wound is concerned.. Because of the length of the discussion it is impossible to fully report it.

The Michigan supreme court quotes Mr. Justice Campbell in *Evans v. People*, 12 Mich. 27, where he says that, when a scientific witness testifies to matters within the comprehension of ordinary witnesses, he stands on the same footing with them as to all such testimony, and as to such matters can only give his opinions where any other observer might do so. Let that idea be applied to the instant case for a moment, and we will see that Dr. Dodson's testimony should not have been taken. It was for the jury to determine whether that which Dodson testified to was true or not. A mere ordinary bystander would not be allowed to form his opinion and testify to it, because, if he did so, he would be crowding the jury out. The matter was one for the jury to determine. The Michigan court say: "It does not require argument to prove that no medical witness called in the case at bar should have been asked for or permitted to give the opinion that a criminal operation had been performed. To say that in this case any operation must have been criminal does not meet the objection. It was the duty and province of the court, not that of expert witnesses, to advise the jury concerning the facts necessary to establish a crime."

The Michigan court further proceeds: "The second hypothetical question, set out in the statement of facts herein, called upon the witness to state who, in his opinion, committed the criminal act, and, by necessary inference, from all data supplied by the question itself, called upon the witness to state, in substance and effect, that respondent was guilty as charged. The court interposed and the question was not answered. But the hypothetical question first above set out is little less objectionable. Undoubtedly, it was competent to include in the premises for an expert opinion the fact that the girl supposed herself

to be pregnant, having passed two monthly periods, be-
cause that fact, like a statement of it made by the girl
as patient to the witness as her physician, might prop-
erly be considered. So all the evidence afforded by ob-
servation of the body of the deceased, considered with re-
spect to the probable time when she died and the immer-
sion of the body in water, should have been included in
the premises stated. But how is it possible for a scientific
opinion in the case to be aided by the facts that bricks
were placed in the sacks with portions of the body, that
deceased had taken cotton root, possessed a catheter, had
made an appointment with respondent about an opera-
tion upon terms stated, that the body had been carried in
an automobile from respondent's office to Ecorse creek,
that her body was dismembered in the office of the physi-
cian consulted by her? It was to data and observations
impossible to lay before the jury and be comprehended by
them, and such connecting and incidental data as afforded
a basis for scientific opinion and deduction, *that the ex-
perts should have been confined."*

The Michigan case is very recent, and may be consulted
with profit because intended to be fair, and it is instructive
as well as apparently fair and the result of much labor.

The defendant had the same right to defend his wife
from assault that he would have had if she had been a
moral woman and he had been a moral man.

I think that what the deceased said and did was prop-
erly part of the *res gestæ,* and shows the provocation suf-
fered by the defendant, and that it was error to exclude
it.